## BUD PECK v. STATE.

No. A-9514. Nov. 15, 1938.
(84 P. 2d 447.)

Haskell Pugh, of Anadarko, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Amos Stovall, Co. Atty., and James F. Hanger, Asst. Co. Atty., both of Anadarko, for the State.

BAREFOOT, J. The defendant was charged by information in the district court of Caddo county, with the crime of murder, was tried, convicted of manslaughter in the first degree, and his punishment assessed by the court at a period of eight years in the penitentiary, and he appeals.

A motion was made to dismiss the appeal for the reason that the same was not filed in this court within six months from the date of judgment and sentence. We have examined the record and find that judgment and sentence was entered on the 22nd day of November, 1937. Several extensions of time were granted, and the case-made was

filed in this court on May 16, 1938. This was within the six months period allowed by law, for the filing of appeals in this court in felony cases. The motion to dismiss states that the appeal was filed May 26, 1938. This is an error. The record shows that the case was filed in this court on May 16, 1938.

The record reveals that when the case was called for trial the defendant appeared without counsel. The court interrogated him and found that he had property and means to employ counsel, but refused to do so for the reason as he stated that they wanted to charge him too much. After due consideration by the court, and upon the recommendation of the county attorney, counsel was appointed to defend him, and the court gave him time to prepare his case. After his conviction the court ordered a transcript to be prepared at the expense of Caddo county, and his case was duly appealed to this court. Counsel withdrew from the case, and when the same was set for oral argument defendant appeared in person and informed the court that he desired to have his case submitted. No brief has been filed on behalf of the defendant or the state.

We have carefully read and examined the record. It reveals that defendant and deceased both lived in the town of Bridgeport, Caddo county. That they had been friends for a long time. That on the 4th day of April, 1937, the deceased came to the home of the defendant late in the afternoon. He was drinking and had with him a pint bottle of whisky a little over half full. Two other parties were present at the home of defendant, Charlie Huey, and his son, Willie Huey. They all drank from the bottle of deceased, Walter Arthurs. Deceased wanted defendant to go with him to his home and defendant refused to do so for the reason that one Joe Bird owned the house in which deceased lived and lived in the basement, and that defendant and Joe Bird were not on good terms. Deceased struck at defendant and missed him. They scuffled

and were separated by the Hueys. In the scuffle a table was broken and the stove was knocked over. Defendant requested all of them to leave and they did so, Charlie Huey going first, his son Willie Huey second, and the deceased, Walter Arthurs, a step or so behind Willie Huey. Just as deceased was starting to leave, he and the defendant were quarreling, and Willie Huey heard defendant say: "I will kill you." His testimony with reference to the shooting was as follows:

"Q. Then what did he do? A. Well, he went back in the house a second and then he came back with the gun. Walt had done walked up the side of the porch, on the northwest corner, turned around and was facing the house, facing Bud. Q. Did Walt have anything in his hand? A. I didn't see nothing. Q. Did he make any advance or threat toward Bud? A. I never noticed him. Q. Bud was going after a gun was he? A. Yes, sir. Mr. Pugh: I object to him leading his witness. The Court: You are leading the witness, Mr. County Attorney; objection sustained. Q. Did Bud come back when he got the gun? A. When he got the gun? Q. Yes. A. Yes. Q. Then what did he do? A. He raised the gun. Q. Did you see him raising the gun? A. Yes, sir. Q. When Bud raised the gun, what was Walt doing? A. Just standing, is all I know. Q. Did he raise his hands? A. I never seen him. Q. You saw Bud standing there with a gun in his hand? A. Yes, sir. Q. And you saw Walt standing how many feet from him? A. I guess about 10 or 12, something like that. Q. And at that time did Walt say a word? A. I never heard him. Q. Did he move a hand or advance in any way? A. If he did, I didn't notice him. Q. What did Bud do? A. He shot him. Q. How long was that after you had heard Bud say 'I am going to kill you'? A. I guess it was about—just a few minutes—just a little while. Q. And that happened in Bridgeport, Caddo county, Oklahoma. A. Yes, sir."

Charlie Huey's testimony corroborated that of his son.

Several witnesses who were either present or close to the scene of the difficulty testified to many facts which corroborated the testimony of the Hueys.

The defendant testified that with the assistance of the Hueys he put the deceased out of his house and that old man Huey hollered "Look out, Bud, he is coming back in," and further testified:

"Arthurs says, 'You God-damned right, I am going to come in, I am going to get you, you son-of-a-bitch.' I says, 'No, stay out.' Q. Did you tell him you would kill him? A. Yes, sir, told him to stay out or I would shoot him. Q. What did he say about that? A. He kept advancing. Q. What did he call you? A. A son-of-a-bitch, and a coward, afraid to go down to his place. Q. You say he started advancing toward you? A. He was advancing toward the house; I couldn't see from where I was standing. Q. Did you see him? A. No, not from where I was getting this fire, at the time I heard that. Q. Did he say he would kill you? A. Yes, sir. Q. Where was he when he said that? A. He was about the west end of the porch, from the way it sounded. Q. Was he away from the house or up close to the house? A. Well, I judge he was maybe five or six steps from the porch, from the sound of his voice. Q. Do you know whether or not he was close to the main part of the house? A. Well, I judge he was ten or fifteen feet; Mr. Huey was west of the house, going west, when he was hollering, telling me to watch out. Q. When you saw him, where was he, if you know? A. He was on the porch, or close to the porch—I think on the porch. Q. Did you shoot him? A. Yes, sir. Q. Bud, at that time, were you afraid of him? A. Yes, sir. Q. Were you afraid he was going to kill you? A. Yes, sir, I knew he would if he got hold of me, or beat me up terrible. Q. Now, did you shoot him by reason of your fear of him there and him rushing you? A. Yes, sir; I didn't know what had happened outside; Mr. Huey, much of a man, had hollered for me to watch out, he was coming at me. In behind the door, right east of where I was gathering this fire, the bedroom, a curtain hung up, I had a shotgun sitting right again the door facing. I reached back and got that. The instant I saw Arthurs, as near as from here to that man there (indicating) the shotgun fired, either from my hands or from my shoulder, I couldn't say which. The jar of the gun moved me back around; I turned back; my face to the east, and went back in the house. Mr. Huey, at that time, had come in from the south side of the house, through the kitchen, in his shirt sleeves, and says, 'Did you kill him'. I says 'I

don't know'. He went to the door, come back, says 'You killed him deader than hell'. He says, 'He is much of a man, the best man I ever had hold of'."

This testimony was denied both by Charlie and Willie Huey, both testifying that they did not come back to the house after the killing, and that Charlie Huey made no such statement. It will be seen that the jury had an opportunity to see and hear the witnesses and observe their demeanor upon the witness stand and were best able to judge where the truth lay. This court will not set aside the verdict of a jury where there is competent evidence to support its findings. All of the witnesses testified that deceased was unarmed. There is no reason for this court to interfere with the judgment and sentence in this case.

In the petition in error, it is urged, that the court erred in certain remarks made in the presence of the jury when they returned into court after considering their verdict, and that the court erred in permitting the court reporter to read to them from the evidence of certain witnesses. We have read the record very carefully, and while we think the court should be careful in comments to the jury where they have retired to deliberate, we find nothing said by the court to justify a reversal of this case.

The defendant had a fair and impartial trial. The jury found the defendant guilty and left his punishment to be assessed by the court which was assessed at eight years in the penitentiary. The evidence reveals that the defendant had served a previous term in the penitentiary upon a charge the same as in this case. Under the circumstances it does not occur to us the judgment and sentence was excessive. The judgment of the district court of Caddo county is therefore affirmed.

DAVENPORT, P. J., and DOYLE, J., concur.